**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MICHAEL D. MARTIN,                  *

Petitioner,                         *

v.                                  *           Civil Action No. MJM-20-3215

WARDEN,                             *

Respondent.                         *

**MEMORANDUM OPINION**

Michael D. Martin filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF 1, 3.  Respondent filed an answer to the petition asserting it must be dismissed because the claims are either procedurally defaulted or lack merit.  ECF 16.  Martin filed a reply.  ECF 18.  No hearing is necessary.  *See* Rule 8(a), *Rules Governing § 2254 Cases in the U.S. Dist. Cts.*; Loc. R. 105.6 (D. Md. 2023); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)).  For the reasons that follow, the petition shall be dismissed and a certificate of appealability shall not issue.

**I.        BACKGROUND**

On April 8, 2013, Martin was indicted on charges, *inter alia*, of first degree murder, conspiracy to commit first degree murder, and use of a handgun in the commission of a felony. ECF 16-2 at 25.  From January 23, 2014, through February 5, 2014, Martin was tried by a jury sitting in the Circuit Court for Baltimore County, Maryland.  ECF 16-9, 16-10, 16-11, 16-12, 16-13, 16-14, 16-15, 16-16, 16-17, 16-18.  The jury returned a guilty verdict on February 5, 2014. ECF 16-18, at 2-3.  On April 16, 2014, the court sentenced Martin to two consecutive life sentences plus a consecutive twenty years.  ECF 16-19, at 23.

Martin filed a direct appeal with the Appellate Court of Maryland,[1] and in an unpublished opinion issued on June 12, 2015, his conviction was affirmed.  ECF 16-2 at 150–89; *Martin v. State*, 223 Md. App. 776, 2015 WL 5884805 (Md. Ct. Spec. App. 2015).  The Appellate Court of Maryland described the facts as follows:

### Evidence Adduced at the Suppression Hearing

On February 18, 2013, at approximately 11:47 p.m., Detective Donald Anderson, a member of the Baltimore County Police Department Homicide Unit, responded to a call for a shooting at the corner of Eastern Boulevard and Old Eastern Avenue. Three victims were at the scene.  Robert Holiday was deceased and the other two victims, Shyteirra Deas and Lavar Young, were transported to the hospital. Detective Anderson found Mr. Holiday's cell phone on the ground.

Detective Anderson talked to several witnesses in the area.  Harry Horney stated that he was driving to work near the time of the shootings.  He saw two African American males standing outside of a Pontiac G6 with the engine running.  They looked as if they purposefully were looking away from Mr. Horney as he drove by, arousing his suspicion.  Another witness, Chad Martinez, heard gunshots and then saw a Pontiac G6 driving at a high rate of speed with its headlights turned off. James Edwards saw a black male with a puffy jacket running down the street at the time of the shooting.  The man was running in the same direction that Mr. Martinez saw the Pontiac G6 driving.

Sherrie Hicks, Mr. Holiday's mother, told police investigators that Mr. Holiday had been at her home at approximately 9:40 p.m. that night.  He told her that he had seen Laquesha Lewis, and they argued about visitation and custody of their daughter, Grace.  This argument turned into a physical altercation.  Mr. Holiday subsequently received a text message from Ms. Lewis stating: "U DEAD."

Police reviewed Ms. Lewis' cell phone records and interviewed her.  Prior to the shooting, Ms. Lewis had a 40–minute phone call with Mr. Holiday.  During that

---

[1] At the time Martin's case was litigated in the Maryland state courts, the Appellate Court of Maryland was named the "Court of Special Appeals" and the Supreme Court of Maryland was named the "Court of Appeals of Maryland."  During the 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of both courts, which took effect on December 14, 2022.

call, Mr. Holiday told her that he was at the bus stop, but he missed the bus and had to walk to another bus stop, where the shooting occurred. As Ms. Lewis was communicating with Mr. Holiday, she was texting Michael [Martin], with whom she had a romantic relationship.

The police obtained Michael's cell phone records and tracked the location of his phone. During the night of the shooting, as he was texting with Ms. Lewis, Michael's phone moved from the first bus stop to within 100 yards of the murder scene. After the shooting, Michael's phone was in Essex, and two days later, the phone was in Prince George's County. After learning that Mikal [Martin's co-defendant] had rented a Pontiac G6, police also tracked the location of his phone on the night of the shooting.

On February 21, 2013, the Baltimore County Career Criminal Apprehension Unit ("CCAU") tracked Michael to Suitland. They observed him exit a residence at 2325 Barclay Place and get into a vehicle. CCAU stopped the vehicle, and they immediately seized the cell phone that they had been tracking to protect against deletion of any information contained on the phone. They then obtained a warrant and searched the contents of the cell phone. Michael was released from custody at 7:00 a.m. the next morning. On March 14, 2013, Michael was arrested and charged with the murder of Mr. Holiday.

During a search of 2325 Barclay Place, the police recovered a single live round of ammunition that was the same caliber and manufacturer as the spent casings found at the crime scene. Tests later confirmed that the live round had been chambered in the same weapon used to commit the shooting. Mikal's identification card also was recovered at the residence.

### Evidence Adduced at Trial

Rabee Boynes, Mr. Holiday, and Mr. Young took a bus from Baltimore City to Middle River. They stopped at Ms. Lewis' house so Mr. Holiday could visit Grace. Mr. Holiday and Ms. Lewis argued, and Mr. Holiday grabbed Ms. Lewis by her neck. Ms. Lewis' family members, with Mr. Boynes and Mr. Young, were able to break up the fight.

At approximately 10:00 p.m., Mr. Boynes, Mr. Holiday, and Mr. Young left Ms. Lewis' house and traveled to Mr. Holiday's mother's house. While Mr. Holiday visited with his mother, Mr. Boynes and Mr. Young waited outside. Mr. Holiday told his mother about the argument with Ms. Lewis and showed her a text message

that Ms. Lewis had sent to him, stating: "U DEAD."  Mr. Holiday then left his mother's house, and the three men went to a bar, Benchwarmers.  On their way, they met several female friends, including Ms. Deas.  Mr. Boynes did not stay with Mr. Holiday at the bar.  Instead, he escorted another friend, Julie, to her home.

Ms. Deas, Mr. Holiday, and Mr. Young stayed at Benchwarmers for a few minutes, and they then walked together to the first bus stop.  After waiting a few minutes for the bus, the three decided to walk to another bus stop on Eastern Avenue.  While the group traveled from the first bus stop to the second bus stop, Mr. Holiday was talking on his cell phone and was agitated.  After they arrived at the second bus stop, Ms. Deas heard shots fired, and she observed a person running away.  Ms. Deas, Mr. Young, and Mr. Holiday were all shot, and they fell to the ground.  A few minutes later, people in the area came to assist them.  Mr. Holiday was unresponsive, and he died at the scene from two gunshot wounds.

Mr. Martinez was on the front porch of his brother's house, across the street from the shooting, when he heard "at least five" gun shots.  Mr. Martinez then saw a Pontiac G6 speeding the wrong way on a one-way street with no headlights on.  The car was 10–15 feet away from Mr. Martinez.  Mr. Martinez saw silhouettes of "at least two" occupants in the vehicle.

Mohammed Ali, the manager of EZ Motors, testified that, on February 15, 2013, Masharie Martin, a friend of Mikal's, rented a Pontiac G6 on behalf of Mikal.  Mikal paid for the rental in cash.  When Mikal did not return the car the next day, Mr. Ali called Masharie.  Masharie called Mikal and asked where it was, but when Mikal did not return the car as Masharie requested, she reported it stolen.

Langston Hughes, one of Michael's and Mikal's friends, walked to the home of Rebecca Romero on the evening of the murder.  Michael and Mikal arrived at the house at approximately midnight in a Pontiac G6.  Mikal asked Mr. Hughes to hold onto the car overnight, and he gave Mr. Hughes the keys.  Mr. Hughes and Ms. Romero then drove Mikal and Michael to Holcomb Court.  Michael and Mikal were both wearing dark colors that night, and they had a black book bag with them.  Ms. Romero previously had seen a black gun in the book bag.

The next day, at 7:30 p.m., Michael, Mikal, Mr. Hughes, and Ms. Romero returned the Pontiac G6 to EZ Motors and rented a Dodge Stratus.  Mr. Hughes dropped Michael and Mikal off in Prince George's County.

Detective Anderson testified that the shooting occurred at approximately 11:43 p.m. on February 18, 2013, and the police recovered a "U DEAD" text from Ms. Lewis on Mr. Holiday's cell phone. Police obtained phone records for Ms. Lewis, Michael, and Mikal. Ms. Lewis' phone records indicated that she had texted Michael's cell phone 19 times in the hour before the murder. At the same time, Ms. Lewis was talking with Mr. Holiday on her land line phone. Detective Anderson was unable to retrieve any of the text messages from either Ms. Lewis' or Michael's phones.

Detective Anderson and other officers testified regarding the search of 5 Holcomb Court, the address Michael listed as his residence, and 2325 Barclay Place, the home where Michael was observed. At the Holcomb Court residence, the police recovered a .40 caliber hollow point bullet, which was the same type of bullet used in the shooting. At the residence on Barclay Place, the police recovered a single live round of ammunition that matched the casings found at the crime scene, as well as an identification card that belonged to Mikal.

Detective Gruss, an expert in "cell phone interpretation, tower analysis, mapping, and PennLink," mapped the cell phone data. He testified that, at 11:07 p.m., Michael's phone was on Martin Boulevard, close to the first bus stop. At 11:18 p.m., Michael's phone was closer to the second bus stop, and at 11:45 p.m., the phone was about 200 yards from the bus stop where the three victims were shot. At 11:55 p.m., the phone was moving away from the bus stop.

Lewis Sanchez, a Sprint employee, reviewed the maps created by Detective Gruss. He testified that the maps properly reflected the data Sprint provided.

!

*Martin*, 2015 WL 5884805 at *1–4. Martin did not file a petition for a writ of certiorari with the Supreme Court of Maryland.

On January 2, 2015, Martin filed a pro se petition for post-conviction relief in state court. ECF 16-2, at 191–259. Martin supplemented his petition once, ECF 16-2 at 261–88, before counsel enrolled and filed an amended petition on December 6, 2018, ECF 16-2, at 289–394. The post-conviction court held hearings on June 27, 2019 and November 7, 2019. ECF 16-20, 16-21. On February 27, 2020, the post-conviction court issued a memorandum opinion denying relief. ECF 16-2 at 353–67.

Martin filed an application for leave to appeal, ECF 16-2 at 368–80, which was denied by the Appellate Court of Maryland on August 14, 2020, ECF 16-2, at 381–83. Martin filed a petition for a writ of actual innocence on October 16, 2020, which was denied on December 7, 2020. ECF 16-2 at 391–394.

Martin filed his petition for writ of habeas corpus in this Court on October 5, 2020, and a supplemental petition on November 25, 2020 (date of Martin's signature). ECF 1; ECF 3. Between the two petitions, Martin alleges thirteen claims for relief: (1) his trial counsel was ineffective for failing to call Lavar Young as a witness at trial (ECF 1 at 2; ECF 3 at 17–19); (2) his trial counsel was ineffective for failing to protect his speedy trial rights (ECF 1 at 2); (3) his trial counsel was ineffective for failing to adequately challenge the cell phone location data at trial (ECF 1 at 2); (4) his trial counsel was ineffective for failing to adequately challenge the ballistics evidence at trial and failing to hire an expert (ECF 1 at 3); (5) his trial counsel was ineffective for failing to take adequate notes during jury selection (ECF 1 at 4); (6) his post-conviction counsel was ineffective for failing to litigate the issues contained his pro se pleadings (ECF 1 at 4); (7) he was denied adequate process during post-conviction because the judge presided over his probation proceedings (ECF 1 at 4); (8) unlawfully obtained evidence was used to secure his conviction (ECF 3 at 5, 7–8); (9) the prosecutor used perjured testimony to secure his conviction (ECF 3 at 5, 8–10); (10) the state lacked authorization to track his whereabouts using his cell phone (ECF 3 at 5, 10–11); (11) the verdict was void because the jury was improperly polled (ECF 3 at 5, 11–12); (12) the ballistics evidence introduced at trial was unreliable (ECF 3 at 13–15); and (13) the cell phone location data introduced at trial was unreliable (ECF 3 at 15–17).

## II.   PROCEDURAL DEFAULT

Procedural default occurs when the petitioner failed to present the claim to the highest state court with jurisdiction to hear it, and the state courts would now find that the petitioner cannot assert that claim. *Mickens v. Taylor*, 240 F.3d 348, 356 (4th Cir. 2001); *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). A procedural default also may occur where a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999); *see also Gray v. Zook*, 806 F.3d 783, 798 (4th Cir. 2015) ("When a petitioner fails to comply with state procedural rules and a state court dismisses a claim on those grounds, the claim is procedurally defaulted."). As the United States Court of Appeals for the Fourth Circuit has explained, "if a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Breard*, 134 F.3d at 619 (citing *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)).

For a person convicted of a criminal offense in Maryland, exhaustion may be accomplished either on direct appeal or in post-conviction proceedings. To exhaust a claim on direct appeal in non-capital cases, a defendant must assert the claim in an appeal to the Appellate Court of Maryland and then to the Supreme Court of Maryland by way of a petition for a writ of certiorari. *See* Md. Code Ann., Cts. & Jud. Proc. §§ 12-201, 12-301. To exhaust a claim through post-conviction proceedings, a defendant must assert the claim in a petition filed in the Circuit Court in which the inmate was convicted within 10 years of the date of sentencing. *See* Md. Code Ann., Crim. Proc. §§ 7-101–7-103. After a decision on a post-conviction petition, further review is available through an application for leave to appeal filed with the Appellate Court of Maryland.

*Id.* § 7-109.  If the Appellate Court of Maryland denies the application, there is no further review available, and the claim is exhausted.  Md. Code Ann., Cts. & Jud. Proc. § 12-202.

A procedural default occurs when a habeas petitioner fails to exhaust such available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."  *Breard*, 134 F.3d at 619 (quoting *Coleman*, 501 U.S. at 735 n.1).  Maryland law does not permit a second and successive state petition for post-conviction relief.  *See* Md. Code Ann., Crim. Proc. § 7-103(a).

Respondents contend all of Martin's claims, except Three, Six, and Seven, are procedurally defaulted.  Respondents contend Claims Six and Seven are non-cognizable on habeas review. Upon review of the parties' arguments and the record, as discussed in detail below, the following claims are procedurally defaulted: One, Two, Four (failure to hire expert), Five, Eight (trial error claim), Nine, Ten (trial error claim), Eleven, Twelve, and Thirteen.

In Claim One, Martin contends that his counsel was ineffective for failing to call shooting victim, Lavar Young, as a witness at trial.  Martin raised the claim in his pro se and counseled post-conviction petitions, ECF 16-2 at 199–206, 298–99, but failed to include it in his application for leave to appeal to the Appellate Court of Maryland, ECF 16-2 at 368–80.  *See Pevia v. Bishop*, Civ. No. ELH-16-1223, 2019 WL 3412649, at *13 (D. Md. July 26, 2019) ("The unexhausted claims are procedurally defaulted, as [Petitioner] failed to present them in his application for leave to appeal and the state courts would now find that he cannot assert those claims.").

In Claim Two, Martin contends that his counsel was ineffective for failing to litigate his speedy trial rights.  Martin did not raise an ineffective assistance of counsel claim in his direct appeal or post-conviction proceedings.  ECF 16-2 at 33–72, 191–259; 261–88; 289–394.  Martin

did raise a trial-court speedy trial error on direct appeal but failed to appeal the claim to the Supreme Court of Maryland.  As such, Claim Two is unexhausted and procedurally defaulted.

In Claim Four, Martin contends that his counsel was ineffective for failing to adequately challenge the ballistics evidence at trial and failing to hire a defense ballistics expert.  In his post-conviction petition, Martin alleged that his counsel was ineffective for failing to challenge the state's expert testimony, ECF 16-2 at 261, but he did not raise the issue of his counsel not hiring a defense ballistics expert.  Accordingly, the part of Claim Four that alleges defense counsel was ineffective for failing to hire an expert is unexhausted and procedurally defaulted.

In Claim Five, Martin contends his counsel was ineffective for failing to take adequate notes during jury selection.  The record reflects that Martin never raised Claim Five in his direct appeal or post-conviction proceedings.  Thus Claim Five is unexhausted and procedurally defaulted.

In Claims Eight and Ten, Martin contends that unlawfully obtained evidence was used to obtain his conviction.  Specifically, Martin contends that the police did not have the authority to track his whereabouts using his cell phone signal to effectuate his arrest on February 21, 2013.  To be sure, Martin did not raise Claims Eight and Ten as a trial error claim on direct appeal.  His counsel filed a motion to suppress the fruits of his arrest on February 21, 2013.  ECF 16-5; ECF 16-6.  However, Martin's counsel argued that the February 21, 2013, arrest was not supported by probable cause (ECF 16-6, at 6–7); Martin's cell phone was illegally seized after the arrest (*id.* at 8–10); the evidence at the Barclay residence was illegally seized (*id.* at 9–11); Martin invoked his right to counsel and the information police extracted related to his cell phone number should be suppressed (*id.* at 12–14); and the street interview a couple of weeks after his arrest was the product of police intimidation and should be suppressed (*id.* at 14–16).  Thus, any trial error claim for

unlawfully tracking Martin's cell phone signal to effectuate his arrest on February 21, 2013, is unexhausted and procedurally defaulted.

However, the record reflects that Martin raised in his pro se post-conviction petition the issue that his counsel was ineffective for failing to file a motion to suppress because the Baltimore Police Department did not have a warrant to track his cell phone signal.  ECF 16-2 at 215–17, 249–50.  During the post-conviction hearing, Martin's counsel advised the court that he was abandoning the issues in his second pro se petition.  ECF 16-21 at 6.  However, Martin raised the cell phone tracking issue in his first pro se petition.  Indeed, the post-conviction court addressed the argument in its opinion.  ECF 16-2 at 363.  The ineffective assistance of counsel claim is not unexhausted and will be addressed on the merits.

In Claim Nine, Martin claims that the prosecutor engaged in misconduct by using perjured testimony to secure his conviction.  The record reflects that Martin included the claim in his direct appeal, but the Appellate Court of Maryland dismissed the claim as waived because Martin's trial counsel failed to object contemporaneously at trial.  ECF 16-2 at 175–79.  However, the prosecutorial misconduct claim is unexhausted and procedurally defaulted because Martin failed to file a petition for a writ of certiorari with the Supreme Court of Maryland.  Martin raised ineffective assistance of counsel for failing to object at trial in his pro se post-conviction petition, ECF 16-2 at 247–49, but defaulted the claim because he did not include it in his application for leave to appeal the denial of his petition to the Appellate Court of Maryland, ECF 16-2 at 368–80.

To the extent Martin asserts ineffective assistance of trial counsel in Claim Nine, he raised the claim in his pro se post-conviction petition, ECF 16-2 at 209–14, 247–49), but failed to include it in his motion for leave to file an application to appeal to the Appellate Court of Maryland. Martin argues that the procedural default should be excused because his post-conviction counsel refused

to litigate the claim.  ECF 18 at 5.  In *Martinez v. Ryan,* 566 U.S. 1 (2012), the United States Supreme Court recognized a "narrow exception" to "the constitutional rule that there is no right to counsel in collateral proceedings," holding that inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance of counsel.[2]  *Id.*  The Court reasoned that "[w]hen an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claims" and such collateral proceedings are "in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance [of counsel] claim."  *Id.* at 10–11.

However, the *Martinez* Court made clear that its holding did not expand the availability of relief for ineffective assistance of counsel in post-conviction proceedings beyond initial-review collateral proceedings.  *See id.* at 15–16 (explaining that "*Coleman v. Thompson*, 501 U.S. 722 (1991) held that an attorney's negligence in a post-conviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings for claims of ineffective assistance of counsel at trial" and noting that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here").  The Court went on to state explicitly that its "holding . . . [did] not concern attorney errors in other kinds of proceedings, including *appeals from initial-review collateral proceedings*, second or successive collateral proceedings*, and petitions for discretionary review in a State's appellate courts."  *Id.* (internal citations omitted) (emphasis added).  "[I]neffective assistance of *appellate* post-conviction counsel . . . do[es] not constitute cause for his failure to exhaust under the limited exception in *Martinez*."  *Mahdi v. Stirling*, 20 F. 4th 846, 989 (4th Cir. 2021).

---

[2] Martin does not assert that his post-conviction counsel's errors should excuse the default of any of the other alleged claims of ineffective assistance of trial counsel.

Any ineffective assistance of counsel claim asserted in Claim Nine is defaulted because Martin failed to include it in the motion for leave to appeal to the Appellate Court of Maryland. Because *Martinez* is not available to excuse attorney errors beyond initial review, the default of Claim Nine is not excused.

In Claim Eleven, Martin contends that his guilty verdict was void because the jury was improperly polled. On direct appeal, the Appellate Court of Maryland found the claim was waived because trial counsel failed to contemporaneously object at trial. ECF 16-2 at 158–62. In any event, Martin failed to file a petition for a writ of certiorari with the Supreme Court of Maryland. Martin raised an ineffective assistance of counsel claim in his first pro se post-conviction petition, ECF 16-2 at 228–33, but Claim Eleven is defaulted because he failed to include it in his application for leave to appeal the denial of his petition to the Appellate Court of Maryland. ECF 16-2 at 368–80.

In Claim Twelve, Martin contends that he was convicted on unreliable ballistics evidence. The record reflects that the claim is unexhausted and procedurally defaulted because Martin never presented this trial error claim on direct appeal or during his post-conviction proceedings.

In Claim Thirteen, Martin contends that he was convicted on unreliable, historical cell site location information. On direct appeal, Martin argued that Detective Gruss should not have been qualified to testify about the historical cell site location information. ECF 16-2 at 47–56. To the extent Martin intended Claim Thirteen to mirror the claim raised on direct appeal, it is procedurally defaulted because Martin did not file a petition for a writ of certiorari with the Supreme Court of Maryland. To the extent Claim Thirteen is based on different facts or a different theory than the claim presented on direct appeal, it has not been fairly presented to the Maryland state courts and is also procedurally defaulted.

Accordingly, the Court will address Claim Three, Claim Four (except failure to hire an expert), Claim Six, Claim Seven, Claim Eight (ineffective assistance of counsel), and Claim Ten (ineffective assistance of counsel) on the merits.

### III.    STANDARD OF REVIEW

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).  The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* 572 U.S. 415, 419–20 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

14

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth Amendment to the Constitution guarantees a criminal defendant the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, 137 S. Ct. 759, 775 (2017). To mount a successful challenge based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687–88. *See Williams*, 529 U.S. at 390. First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 137 S. Ct. at 775.

With regard to the first prong, the petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688; *see also Harrington*, 562 U.S. at 104. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Id.* at 88 (quoting *Strickland*, 466 U.S. at 690). The Supreme Court has reiterated that the "first prong sets a high bar." *Buck*, 137 S. Ct. at 775. Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Id.* (citation omitted). The standard for assessing such competence is "highly deferential" and has a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 669. Judicial scrutiny of counsel's performance must be "highly deferential" and not based on hindsight. *Stokes v. Stirling*, 10 F. 4th 236, 246 (4th Cir. 2021) (citing *Strickland*, 466 U.S. at 689).

Second, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Id.* at 687. To satisfy the "prejudice prong," a petitioner must show that "there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 137 S. Ct. at 776.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687.  A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id.* at 696.  Thus, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  A petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

In evaluating whether the petitioner has satisfied the two-pronged test set forth in *Strickland*, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.  Nor must a court address both components if one is dispositive, *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015), because failure to satisfy either prong is fatal to a petitioner's claim.

## V.      ANALYSIS

### Claim Three

In Claim Three, Martin contends that his counsel was ineffective for failing to adequately challenge the use of historical cell site location information at his trial, including failing to hire a defense expert to challenge the state's interpretation of the data.  Martin raised the issue in his pro

se and counseled post-conviction petitions. ECF 16-2 at 215–17, 250–51; 295–97. The post-conviction court denied the claim, concluding that the prosecution witnesses were qualified to testify on historical cell site data and Martin's counsel was not ineffective in his cross-examination of these witnesses. *Id.* at 364. The post-conviction court also found that even if counsel had hired an expert to challenge the reliability of the cell cite location information, the outcome of the trial would not have been different. *Id.* at 366.

At trial, Sprint radio frequency engineer, Lewis Sanchez, testified about the historical cell site location information (CSLI) extracted from Martin's cell phone records.[3] ECF 16-12 at 32–72. Sanchez testified that Sprint's call detail records contain an exact geographical point for the origin of a cell call, with a margin of error of 300 to 400 feet. *Id.* at 34. The margin of error was a point of contention at trial because Sanchez acknowledged that he had previously testified that the margin of error was 300 to 400 yards. *Id.* at 40. Sanchez testified that the numbers "change from time to time" based on information provided by the original equipment manufacturers, improvements in the software, and increased data sampling. *Id.* at 45, 65, 71. Martin's defense counsel cross-examined Sanchez on his inconsistent testimony. *Id.* at 37–41. Despite the defense counsel's objections, the trial court accepted Sanchez as an expert. *Id.* at 55. Sanchez testified that the state correctly plotted the geographical location of Martin's cell phone around the time of the murder. *Id.* at 58–59.

Retired Detective Charles Gruss of the Baltimore Police Department testified that he conducted the analysis of Martin's cell phone records. ECF 16-13 at 17–47. The Baltimore Police

---

[3] Sprint refers to historical cell cite location data as "per call measurement data" or "PCMD." For clarity, the Court refers to the generic term, "cell site location data" or "CSLI." *See Carpenter v. United States*, 138 S. Ct. 2206 (2018).

Department identified Martin's number through their interview with Laquesha Lewis.  *Id.* at 19. The victim's cell phone indicated that he was on the phone with Lewis around the time of his murder.  *Id.*  When the police obtained Lewis's phone records, they showed that she was frequently in contact with Martin.  *Id.*  Martin's counsel objected to Detective Gruss's competency to interpret the cell site location information, but the trial court permitted the testimony.  *Id.* at 22.  Detective Gruss testified that at the time of the shooting, Martin's phone was 200 yards from the bus stop where the shooting occurred.  *Id.* at 33.

The record reflects that Martin's trial counsel objected to the qualification of both Sanchez and Detective Gruss.  It also reflects that counsel aggressively challenged the accuracy of Sanchez's testimony about the margin of error for Sprint's cell site location information on cross-examination.  Martin may disagree with the post-conviction court's conclusion that his counsel's performance was not deficient, but he fails to show that the court's dismissal of the claim was an unreasonable application of *Strickland.*

During the post-conviction hearing, Martin called an expert from York Digital Forensics Laboratory that testified that CSLI cannot be validated because the cell phone companies do not collect the data for forensic purposes and do not publish the means in which they calculate the information.  ECF 16-20 at 6–84.  Martin's counsel testified that he did not recall attempting to hire an expert; his strategy was to challenge Sanchez's inconsistent testimony on cross-examination.  *Id.* at 21, 28.  As mentioned above, the post-conviction court was unconvinced that defense expert testimony of the type offered at the post-conviction hearing would have changed the outcome of the trial.  ECF 16-2 at 366.

When reviewing ineffective assistance of counsel claims based on the failure to hire an expert, the Supreme Court has provided the following guidance:

Strategic decisions—including whether to hire an expert—are entitled to a strong presumption of reasonableness. Defense lawyers have limited time and resources, and so must choose from among countless strategic options. Such decisions are particularly difficult because certain tactics carry the risk of harming the defense by undermining credibility with the jury or distracting from more important issues. The burden of rebutting this presumption "rests squarely on the defendant, and "it should go without saying that the absence of evidence cannot overcome it. In fact, even if there is reason to think that counsel's conduct was far from exemplary, a court still may not grant relief if the record does not reveal that counsel took an approach that no competent lawyer would have chosen.

This analysis is doubly deferential when, as here, a state court has decided that counsel performed adequately. A federal court may grant habeas relief only if a state court violated *clearly established* Federal law, as determined by *the Supreme Court* of the United States. § 2254(d)(1). This wide latitude means that federal courts can correct only "extreme malfunctions in the state criminal justice system. And in reviewing the work of their peers, federal judges must begin with the presumption that state courts know and follow the law. Or, in more concrete terms, a federal court may grant relief only if *every* fairminded jurist would agree that *every* reasonable lawyer would have made a different decision.

*Dunn v. Reeves*, 141 S. Ct. 2405, 2410–11 (2021) (cleaned up). Martin fails to prove that no competent attorney would have chosen the same strategy as his trial counsel and therefore fails to meet the stringent standard for relief on his claim that his counsel was ineffective for failing to hire an expert on cell cite location information.

## Claim Four

In Claim Four, Martin contends that his trial counsel was ineffective for failing to adequately challenge the ballistics evidence introduced against him at trial. Specifically, Martin contends that his counsel should have excluded expert testimony that an unfired bullet found during the search of the Barclay Place residence was cycled through the same weapon that fired the spent shell casings found at the crime scene. Martin raised the claim in his pro se post-conviction petition. ECC 16-2 at 261. The post-conviction court denied the claim, finding that

there were no legitimate grounds to challenge the expert testimony and counsel was not deficient. *Id.* at 365–366.

At trial, the state called Sergeant Mark Ensor of the forensic sciences division of the Baltimore Police Department.   ECF 16-14 at 52–60; ECF 16-15 at 2–15, 21–28.   The court accepted Sergeant Ensor as an expert in firearm and toolmark identification.   ECF 16-14 at 60. Sergeant Ensor testified that all eight of the shell casings found at the crime scene were fired from the same unknown weapon.   ECF 16-15 at 10.   Ensor testified that an unfired bullet was found under a pillow during the search of the Barclay Place residence.   *Id.*   He testified that three out of the eight fired shell casings had markings that matched the unfired shell casing, establishing that they were loaded against the same feed ramp in the same firearm.   *Id.* at 12–13.

The record reflects that Martin's counsel did not object to the qualification of Ensor as an expert or his testimony matching the unfired bullet to the crime scene casings, but as noted by the post-conviction court, Martin fails to identify any grounds by which he could have objected. Sergeant Ensor testified that he went through a three-year training program under a firearm and toolmark expert, where he was tested and examined for proficiency.   *Id.* at 53.   He was one of the first persons certified by the Association of Firearm and Toolmark Examiners (AFTE) and has been a member since 1995.   *Id.* at 55.   He attended thirteen AFTE seminars, five regional seminars, nine armor courses, and specialized courses presented by the ATF and FBI.   *Id.* at 54.   Ensor also testified that he has performed firearm and toolmark examinations for nineteen years and he redesigned the firearm and toolmark identification course for the George Washington Institute in Washington, D.C.   *Id.* at 55.

Martin offers nothing other than disagreement with Ensor's testimony and the post-conviction court's disposition of his claim, which is insufficient to meet the standard for habeas

relief. Martin fails to show that the state court unreasonably applied *Strickland* and therefore Claim Four is dismissed.

### Claim Six and Seven

In Claim Six, Martin contends that his post-conviction counsel was ineffective for failing to litigate his post-conviction issues. In Claim Seven, Martin contends that he was denied due process in his post-conviction hearing because it was conducted by the same judge that presided over his probation proceedings. Respondents argue that Claims Six and Seven are non-cognizable in federal habeas review. ECF 16 at 63–68. The Court agrees. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). Claims of error occurring in a state post-conviction proceeding cannot serve as a basis for federal habeas corpus relief. *Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988).

### Claims Eight and Ten

In Claims Eight and Ten, Martin contends that his counsel was ineffective for failing to suppress the fruits of his arrest on February 21, 2013, because the police unlawfully tracked his cellphone without a warrant.[4] As noted above, Martin raised the issue in his pro se post-conviction petition. The post-conviction court addressed the claim, finding:

> Here, Petitioner seems to be claiming that Detective Gruss "used a Pennlink trackling [sic] device to trace the Petitioner's phone whereabouts. In other words, that at some point Detective Gruss tracked the location of his cell phone. This is not borne out by the record. There is no evidence that Petitioner's cell phone was tracked before Judge King signed the order allowing for the collection of his cell phone records. The police were surveilling the Barclay Place address when the

---

[4]     Claims Eight and Ten specifically allege that Martin's conviction was obtained using illegally obtained evidence. As discussed, *supra*, the trial error claim was procedurally defaulted, but Martin did fully exhaust an ineffective assistance of counsel claim. The Court has construed his *pro se* habeas petition liberally to assert a claim for ineffective assistance of counsel in Claims Eight and Ten.

Martins pulled up; Petitioner was arrested; and his cell phone was seized to prevent the destruction of evidence.

ECF 16-2 at 363–64.  However, the record reflects by clear and convincing evidence, that Baltimore Police Department did use equipment to track Martin's cell phone to determine his location on February 21, 2013.  There is no evidence in the record that the police obtained a warrant to track his cell phone in real time.

During the hearing on Martin's motion to suppress, Detective Donald Anderson testified that they had historical cell site location data from Michael Martin's phone before he was arrested, but pinpointed Martin's exact location on February 21, 2013, through "GPS tracking locations and equipment" used by the Career Criminal Apprehension Unit.  ECF 16-5 at 11–13.  The warrant for Martin's historical cell site location information establishes that the return from Sprint could not have led law enforcement to his location on February 21, 2013, because it called for data from January 1, 2013 through February 19, 2013.  ECF 16-1 at 2.

In other words, the record establishes that law enforcement could not have used the historical data from Sprint to locate Martin on February 21, 2013.  It also establishes that law enforcement used the Career Criminal Apprehension Unit's "equipment" to pinpoint his location and the Baltimore Police Department did not have a warrant to track Martin's cell phone in real time on February 21, 2013.

In *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the United States Supreme Court held that the Fourth Amendment required a warrant before law enforcement could access historical cell site location information because "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI."  *Id.* at 2217.  The Court explained:

Although [cell site] records are generated for commercial purposes, that distinction does not negate Carpenter's anticipation of privacy in his physical location. Mapping a cell phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts.  As with GPS information, the time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his "familial, political, professional, religious, and sexual associations."  These location records "hold for many Americans the 'privacies of life.'"  And like GPS monitoring, cell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools.  With just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense.

In fact, historical cell-site records present even greater privacy concerns than the GPS monitoring of a vehicle we considered in *Jones*.  Unlike the bugged container in *Knotts* or the car in *Jones,* a cell phone—almost a "feature of human anatomy," tracks nearly exactly the movements of its owner.  While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time.  A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales.  Accordingly, when the Government tracks the location of a cell phone it achieves near perfect surveillance, as if it had attached an ankle monitor to the phone's user.

*Id.* at 2217–18 (internal citations omitted).  *Carpenter* did not address the use of real-time tracking

of cell site location through "pinging" the cell phone or use of a cell tower simulator.

In 2011, relying on established Fourth Amendment precedent, this Court concluded that

use of a particular cellular telephone as a tracking device to aid in execution of an arrest warrant

requires obtaining a tracking device warrant, which in turn requires a showing of probable cause.

*In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified*

*Wireless Tel.*, 849 F. Supp. 2d 526 (D. Md. 2011).  In 2016, three years after Martin's trial, the

Appellate Court of Maryland held in *State v. Andrews* that "unless a valid exception to the warrant

requirement applies, the government may not use a cell phone simulator without a warrant . . . that

requires a particularized showing of probable cause, based on sufficient information about the

technology involved to allow a court to contour reasonable limitations on the scope and manner of the search, and that provides adequate protections in case any third-party cell phone information might be unintentionally intercepted." 227 Md. App. 350, 412–13 (Md. Ct. Spec. App. 2016).

"[W]here an ineffectiveness claim is based on counsel's failure to file a motion to suppress," under the "deficient performance prong of *Strickland,* it is enough to call into question counsel's performance that an unfiled motion would have had 'some substance.'" *Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 524–25 (4th Cir. 2016). The prejudice prong in such cases has two components, (1) "the motion was meritorious and likely would have been granted, and (2) a reasonable probability that granting the motion would have affected the outcome of his trial." *Id.* (citing *Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986)). At the time of trial or at the time motions to suppress were litigated, Martin's counsel did not have the benefit of the *Carpenter* or the *Andrews* decision. An argument could be made that a motion to suppress would have had substance based on existing Fourth Amendment precedent. In any event, Martin's claim fails because he cannot show that the motion would have been granted or that it would have affected the outcome of his trial.

When Martin was arrested on February 21, 2013, he invoked his right to counsel while Detective Anderson was advising him of his *Miranda* rights. ECF 16-5 at 17. The only information relevant to the case that police extracted from Martin before he invoked the right to counsel was his cell phone number. *Id.* at 17. Martin's counsel argued that Martin's admission to his cell phone number should be suppressed because it was the "fruit" of an arrest that was not supported by probable cause. ECF 16-6 at 12–13. The trial court denied counsel's argument that the cell phone number should be suppressed because asking a defendant for his cell phone number is a "routine booking question" that is exempted from *Miranda*, and the police would have

ultimately received the information from alternate sources. *Id.* at 17–18. Indeed, the police had confirmation of Martin's cell phone number from his Facebook page and probation files. ECF 16-5 at 11; 16-6 at 12. Even if Martin's counsel could have advanced an alternative theory that his warrantless arrest on February 21, 2013, violated the Fourth Amendment based on the tracking of his cell phone, he cannot establish that a motion to suppress the "fruit" of his arrest would have been successful.

Martin fails to establish that he was prejudiced by his counsel's failure to file a motion to suppress based on the police tracking his cell phone without a warrant to effectuate his arrest on February 21, 2013. Thus, Claims Eight and Ten lack merit and are dismissed.

### CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Because the accompanying Order is a final order adverse to the applicant, 28 U.S.C. § 2253(c)(1) requires issuance of a certificate of appealability before an appeal can proceed.

A certificate of appealability may issue if the prisoner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court rejects constitutional claims on the merits, a petitioner may satisfy the standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a petition is denied on procedural grounds, the petitioner may meet the standard by showing that reasonable jurists "would find it

debatable whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling."  *Id.*

Martin has failed to satisfy this standard on any of his claims.  Therefore, a certificate of appealability shall not issue.

A separate order dismissing the petition and denying a certificate of appealability follows.


_____3/11/24_____                                    _____/S/_____
Date                                                            Matthew J. Maddox
                                                                   United States District Judge